IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

ALEXANDRA S.,[1]

      Plaintiff,

v.

                                    Case No. 3:25-cv-221-NJR

FRANK J. BISIGNANO,[2]
Commissioner of Social Security,

      Defendant.

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Plaintiff Alexandra S. ("Plaintiff") seeks Disabled Adult Child (DAC) benefits under Title II of the Social Security Act. Under the law, she is entitled to them if she was disabled before she became 22 years old on November 9, 2017.[3] Though Plaintiff was only diagnosed with Ehlers-Danlos syndrome at the end of 2018, her symptoms began much earlier. The Social Security Administration (the "Agency") determined that Plaintiff's Ehlers-Danlos syndrome was a "severe impairment" during the time in question. But, relying on medical evidence pre-dating her Ehlers-Danlos syndrome diagnosis, the Agency's Administrative Law Judge (ALJ) decided Plaintiff was not disabled and denied her application. Plaintiff appeals this decision, which was made final by the Commissioner of Social Security. For the following reasons, the Commissioner's decision is reversed and remanded.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* FED. R. CIV. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] Frank J. Bisignano is the current Commissioner of Social Security. *See* FED. R. CIV. P. 25(d); 42 U.S.C. § 405(g).

[3] *See* 20 C.F.R. § 404.102(a).

### PROCEDURAL HISTORY

The procedural history underlying Plaintiff's application is long and complex. She initially applied for DAC on December 7, 2015. (Tr. 15). After an initial denial and a denial on reconsideration, *id.* at 144–46, 151–55, Plaintiff requested a hearing before an ALJ, *id.* at 158. That first hearing resulted in an unfavorable decision by an ALJ on October 1, 2018. *Id.* at 12–37. When the Appeals Council for the Agency denied review, *id.* at 1–5, Plaintiff appealed to this Court, *id.* at 887–88. On September 25, 2020, Magistrate Judge Gilbert Sison reversed and remanded the Agency's decision for rehearing and reconsideration. *Id.* at 892–907.

Thus began round two. After a rehearing, ALJ Katherine Jecklin denied Plaintiff's application for DAC. *Id.* at 789–826. After an appeal to this Court, Plaintiff's case was once again remanded for rehearing and reconsideration. *Id.* at 1390–98.

For the third round, the Agency's Appeals Council directed ALJ Jecklin to resolve certain specific issues on remand, including whether Plaintiff's Ehlers-Danlos syndrome was a medically determinable impairment and what effect it may have had on her functional limitations.[4] *Id.* at 1399, 1401–03. After the rehearing, ALJ Jecklin again denied Plaintiff's application, finding she was not disabled between November 10, 2013, and November 9, 2017. *Id.* at 1274–1312.

Plaintiff now appeals this latest decision under sentence four of 42 U.S.C. § 405(g). (Doc. 1). She raises two issues: whether, in evaluating her Residual Functional Capacity (RFC), the ALJ erred (1) by failing to fully and fairly develop the record, or (2) by failing to properly evaluate her credibility. *Id.* at 4. The Commissioner timely filed a brief in opposition

---

[4] Further, the Appeals Council limited the ALJ to considering only the period prior to February 16, 2021. (Tr. 1403; *see id.* at 1378–89 (decision by a different ALJ finding Plaintiff disabled as of February 16, 2021)).

(Doc. 18), to which Plaintiff timely replied (Doc. 19).

## STANDARD OF REVIEW

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." *Id.* The Supreme Court defines substantial evidence as "'more than a mere scintilla,' and mean[ing] only 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

"An ALJ need not specifically address every piece of evidence, but must provide a 'logical bridge' between the evidence and his conclusions." *Butler v. Kijakazi*, 4 F.4th 498, 501 (7th Cir. 2021)). The reviewing court may not "reweigh the evidence, resolve debatable evidentiary conflicts, determine credibility, or substitute [its] judgment for the ALJ's determination so long as substantial evidence supports it." *Gedatus v. Saul*, 994 F.3d 893, 900 (7th Cir. 2021)). Where an ALJ ignores a whole line of evidence contrary to the ruling, however, a district court cannot assess whether the ruling rested on substantial evidence and must remand to the agency. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003).

Even when the ALJ commits error, a remand is not necessary if the error is harmless. *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011) (citing *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010)). Where the Court "look[s] at the evidence in the record" and can "predict with great confidence" that a remand to the ALJ would generate the same result, the error is deemed harmless. *Id.* In that situation, a remand "would be a waste of time and resources for

both the Commissioner and the [Plaintiff]." *Id.*

## DISABILITY UNDER THE SOCIAL SECURITY ACT

To qualify for DAC benefits, a claimant must, *inter alia*, have been disabled before "bec[oming] 22 years old." 20 C.F.R. § 404.350(a)(5). Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities demonstrated by accepted diagnostic techniques. 42 U.S.C. § 423(d)(3). "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit. 20 C.F.R. § 404.1572.

Social Security regulations set questions for the ALJ to consider in assessing whether a claimant is disabled in a series of five sequential steps: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment or combination of impairments? (3) Does the impairment meet or equal any impairment enumerated in the regulations as being so severe as to preclude substantial gainful activity? (4) Does the claimant's RFC[5] leave her unable to perform her past relevant work? and (5) Is the claimant unable to perform any other work existing in significant numbers in the national economy?

---

[5] In between Steps Three and Four, the ALJ must determine the claimant's RFC. 20 C.F.R. § 404.1520(e). The RFC (residual functional capacity) is "the most [the claimant] can still do despite [her] limitations," and is developed in consideration of a claimant's "ability to meet the physical, mental, sensory, and other requirements of work" based on "all of the relevant medical and other evidence." 20 C.F.R. § 404.1545(a)(1)–(4).

*See* 20 C.F.R. § 404.1520; *Kuhn v. Kijakazi*, No. 22-1389, 2022 WL 17546947, at *2 (7th Cir. Dec. 9, 2022).

An affirmative answer at either Step Three or Step Five leads to a finding that the claimant is disabled. A negative answer at any step, other than at Step Three, precludes a finding of disability. The claimant bears the burden of proof at Steps One through Four. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant is able to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

### EVIDENTIARY RECORD

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is limited to the points raised by Plaintiff.

### I.      Relevant Medical Records

From 2014 through at least December 2017, Plaintiff received regular medical attention from Dr. Kristen Stabell, her primary care provider. (Tr. 399–442, 465–67, 468–91, 612–47, 738–42). Plaintiff frequently raised both physical and mental concerns to Dr. Stabell. *See id.*

Though the question of Plaintiff's Ehlers-Danlos syndrome[6] (EDS) is central to this case, the first indication of her EDS does not appear in the record until December 3, 2018, in the treatment notes of Dr. Laurence Kinsella. *Id.* at 1152–53. Progress notes from two

---

[6] "Ehlers-Danlos syndromes (EDS) are a group of inherited connective tissue disorders caused by abnormalities in the structure, production, and/or processing of collagen. The symptoms of EDS vary by type and range from mildly loose joints to serious complications." *Ehlers-Danlos syndrome*, NAT'L INSTS. OF HEALTH: GENETIC & RARE DISEASES INFO. CTR. (Feb. 2026), https://rarediseases.info.nih.gov/diseases/6322/ehlers-danlos-syndrome.

February 2020 medical appointments (pulmonologist and dermatologist) acknowledge her history with EDS. *Id.* at 1163, 1171–72. Further, the dermatologist progress notes describe multiple physical symptoms (nausea, bloody stools, joint pain, muscle pain, dehydration, lightheadedness, and slow bowel movements) as consistent or associated with her EDS. *Id.* at 1170–72. And in June 2020, Dr. Dan Groepper confirmed that Plaintiff met the diagnostic criteria for hypermobile Ehlers-Danlos syndrome.[7] *Id.* at 1187.

## II.    State Agency Examiners

In response to Plaintiff's initial 2015 application for DAC benefits, a State Agency Disability Determination was conducted. (Tr. 101–16). Dr. Lenore Gonzalez and Dr. Donald Henderson examined Plaintiff and concluded she had the following medically determinable impairments: non-severe fibromyalgia, non-severe "Other Disorders of Gastrointestinal System," severe affective disorders, severe anxiety disorders, and severe personality disorders. *Id.* at 101–10. Dr. Henderson determined that, though her statements were partially credible, Plaintiff had "asserted multiple physical issues which were either not noted as [medically determinable impairments] or were evaluated as non-severe." *Id.* at 111. No state-agency examiner assessed Plaintiff's physical RFC. *Id.* at 110–13. In considering Plaintiff's mental RFC, Dr. Henderson found Plaintiff had only moderate limitations in some areas of mental function (and no significant limitations in others). *Id.* at 111–13.

---

[7] "Ehlers-Danlos syndromes (EDS) are rare, congenital disorders comprising a heterogeneous group of hereditary connective tissue disorders. Among the 13 recognized subtypes, the hypermobile type (hEDS) is the most common subtype and mostly affects women. hEDS is characterized by hypermobility of the joints, mild hyperextensibility of the skin, and fragility of the tissues. Muscles, ligaments, joints, internal organs, and blood vessels may be affected in this condition." Katharina Müller, Joana C. Thiel, Lena Schopen, Bruno Fimm, Jörg B. Schulz & Andrea Maier, *Impaired Attention and Cognitive Deficits Associated with Pain and Autonomic Symptoms in Hypermobile Ehlers-Danlos Syndrome: A Pilot Study*, 36 CLINICAL AUTONOMIC RSCH. (forthcoming 2026), https://link.springer.com/article/10.1007/s10286-026-01191-7#Abs1 [https://doi.org/10.1007/s10286-026-01191-7].

On reconsideration in July 2016, *id.* at 118–42, state-agency medical examiners affirmed the original finding that Plaintiff's medically determinable physical impairments were non-severe, *id.* at 135. Again, no assessment of Plaintiff's physical RFC was conducted. *Id.* at 138–41. The state-agency examiners again found Plaintiff had moderate limitations in some areas of mental functioning, but no significant limitations in others. *Id.* at 139–41.

### DECISION OF THE ALJ

In reaching her decision, the ALJ considered the entire record. (Tr. 1279, 1287).

At Step One, the ALJ concluded Plaintiff had not engaged in substantial gainful activity since November 10, 2013, the alleged onset date of her disability. *Id.* at 1280.

At Step Two, the ALJ concluded Plaintiff had the following severe medically determinable[8] impairments: major depressive disorder, bipolar disorder, generalized anxiety disorder, borderline personality disorder, posttraumatic stress disorder, and EDS.[9] *Id.* She further found that Plaintiff had the following non-severe medically determinable impairments: gastroesophageal reflux disease, irritable bowel syndrome, and a history of an eating disorder. *Id.* at 1280–81.

At Step Three, the ALJ concluded Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of any impairment enumerated in the regulations. *Id.* at 1283–85.

In coming to this conclusion, the ALJ examined the severity of Plaintiff's mental

---

[8] A medically determinable impairment is one which "result[s] from anatomical, physiological, or psychological abnormalities that can be shown by medically acceptable clinical and laboratory diagnostic techniques." 20 C.F.R. § 404.1521.

[9] Plaintiff does not challenge the ALJ's decision at Step Two, but it is worth noting that ALJ Jecklin did not at any point explain why EDS was a severe impairment. This would not matter but for (1) the underdevelopment of the ALJ's discussion of Plaintiff's EDS in the RFC determination and (2) the lack of medical evidence concerning Plaintiff's EDS, as discussed below.

limitations and determined that Plaintiff had moderate limitations in the functional areas of (1) understanding, remembering, or applying information; (2) interacting with others; (3) concentrating, persisting, or maintaining pace; and (4) adapting and managing herself. *Id.*

The ALJ then determined Plaintiff's RFC. *Id.* at 1285–99. To develop the RFC (essentially, the extent to which Plaintiff's symptoms limited her ability to work), the ALJ was required to determine (1) whether Plaintiff had an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the alleged symptoms, and (2) the extent to which the alleged intensity, persistence, or limiting effects of Plaintiff's symptoms were consistent with the evidence in the record. *Id.* at 1286.

The ALJ discussed Plaintiff's subjective reports of her symptoms and limitations based on her function report and her hearing testimony. *Id.* at 1286–87. ALJ Jecklin determined, however, that while the allegations "about the intensity, persistence, and limiting effects of her symptoms" were "somewhat consistent," they ultimately were "not entirely supported by the objective medical evidence." *Id.* at 1287.

With respect to Plaintiff's mental impairments, *id.* at 1287–94, 1295–98, the ALJ first focused on the mismatch between the severity of the alleged symptoms and the routine nature of her treatment. *Id.* at 1292. She also thought Plaintiff's work history (part-time stints in 2013 and 2014 assisting her aunt and disabled grandmother, as well as a two-month gig working for a store called the Plant Stand [10]) undermined the alleged severity of her symptoms. *Id.* at 1293. Further, ALJ Jecklin thought that Plaintiff's daily activities were not

---

[10] This part-time role required plaintiff to work between three and twelve hours a week. (Tr. 347). She reports that her only responsibility was watering plants, though her employer reported that she also worked as a cashier and helped clean and sort. *Compare id.* at 327 (plaintiff's report), *with id.* at 347 (employer's report). The ALJ noted that Plaintiff reported receiving accommodations, whereas the employer stated that she had not. *Id.* at 1293.

"significantly impaired," despite some episodes of "increasing difficulty." *Id.* And ALJ Jecklin noted that Plaintiff's primary care provider had expressed concerns that Plaintiff's mother might have been "enabling her symptoms." *Id.*

The ALJ then went through the medical evidence in the record, listing the weight she had given each in determining Plaintiff's mental RFC. *Id.* at 1295–98. She ultimately determined that Plaintiff's mental RFC should accommodate moderate limitations in (1) interacting with others; (2) understanding, remembering, and applying information; (3) concentration, persistence, and pace; and (4) in adapting and managing herself. *Id.* at 1298–99.

The ALJ spilled considerably less ink on Plaintiff's physical impairments.[11] After discussing Plaintiff's EDS diagnosis (which occurred after the end of the relevant period), ALJ Jecklin considered whether the diagnosis was consistent with the medical evidence in the record. *Id.* at 1294–95. The ALJ noted that Plaintiff had reported "diffuse body pain," "pain-related issues in all areas of her body," "alternating diarrhea and constipation," "nausea," "upset stomach," "bloody stool," "total body pain," "weakness, joint pain, appetite issues," "weight loss, rectal bleeding, bloating, and chronic muscle and joint pain" from 2014 to 2017. *Id.* Additionally, an examination found "global discomfort in the abdominal area,

---

[11] (*Compare* Tr. 1294–95 (devoting seven paragraphs to a history of Plaintiff's diagnosis with EDS in 2018, an identification of consistent symptoms from during the relevant period, and an announcement of physical limitations), *and id.* at 1298 (containing three paragraphs: one paragraph affording no weight to the state-agency physical examinations and instead imposing a physical limitation "to a light exertional level with additional restrictions on climbing and postural movements," one paragraph affording no weight to a chiropractor's statements, and one paragraph reiterating the physical limitations imposed "given the severe impairments [sic] Ehlers-Danlos syndrome"), *with id.* at 1287–93 (spending 18 paragraphs noting inconsistencies between Plaintiffs "statements about the intensity, persistence, and limited effects of her symptoms" and the "objective medical findings regarding her mental impairments"), *and id.* at 1293–94 (devoting five paragraphs to the determination of Plaintiff's mental RFC), *and id.* at 1295–98 (spending six paragraphs affording variable weight to medical evidence in the record as to Plaintiff's mental impairments)).

especially in the lower abdomen." *Id.* at 1295. Though the ALJ suggested that these reports

and findings were undercut by some more positive reports and examinations with normal

findings,[12] she ultimately "conclude[d]" that Plaintiff's physical symptoms were "related to

and correlated with the ultimate diagnosis of [EDS]." *Id.* at 1294–95.

Having established that Plaintiff suffered from EDS during the relevant time period

(prior to her diagnosis), the ALJ then announced her physical RFC:

> In balance of [Plaintiff's] subject report, the foregoing supports limiting [Plaintiff] to a light exertional level, reduced by restrictions for climbing, and postural movements of balancing, stooping, kneeling, crouching, and crawling. These limitations serve to prevent exacerbation of symptoms related to [Plaintiff's] physical impairments in light of her complaints of pain, abdominal issues, and the aforementioned observations during treatment.

*Id.* at 1295. Following this somewhat summary articulation of Plaintiff's physical RFC, the

ALJ transitioned back to discussing Plaintiff's mental impairments. *Id.* at 1295–98. After three

pages of this, ALJ Jecklin returned to the question of Plaintiff's physical RFC. *Id.* She

explained what weight was afforded to the medical opinions in the record concerning

physical impairments as follows:

> Turning to physical impairments, State-agency consultants, Dr. Gonzalez and Dr. Hinchen, opined [that] [Plaintiff's] physical limitations were non-severe. I afford these findings no weight. Although they attempt to support their findings with narrative explanation and cites to the record, including examination findings, the evidence as a whole suggests limitations are needed. [Plaintiff] reported symptoms of diffuse pain and abdominal issues with diagnosis of [EDS] not long after [Plaintiff] reached the age of 22. Such diagnosis is consistent with her reported symptoms during the relevant period, and I find that limitations to a light exertional level with additional restrictions on climbing and postural movements, as noted in the residual functional capacity above, are warranted.
> To any extent any of the statements included in the mineral assessment by the chiropractor could be read as an opinion, I give them no weight. A chiropractor is not an acceptable medical source under the applicable rules.

---

[12] And the fact that, in 2014, Plaintiff "reported recently joining a gym." (Tr. 1294).

Further, any assessments are largely speculative and vague.

*Id.* at 1298 (citations omitted). ALJ Jecklin concluded her treatment of Plaintiff's physical RFC

by reiterating the physical limitations she had enumerated earlier:

> Specifically, the claimant is limited to a light exertional level to account for reduced lifting/carrying, given the severe impairments Ehlers-Danlos syndrome [sic], with accompanying symptoms such as pain and abdominal symptoms, all of which could be worsened and/or pose difficulties in the lifting/carrying of increased weights. She must also avoid climbing ladders, ramps, and scaffolds and only occasionally climb ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, as such activities would aggravate her symptoms, such as pain and abdominal effects, or could pose safety risks should she experience these symptoms while performing these activities.

*Id.*

Because Plaintiff had no past relevant work, the analysis proceeded past Step Four to

Step Five. *Id.* at 1299. At Step Five, the ALJ relied on the hearing testimony of the Vocational

Expert to identify three occupations that a hypothetical individual with Plaintiff's age,

education, work experience, and RFC could perform: housekeeper/cleaner (30,000 such

positions in the national economy), mail room clerk (30,000 such positions in the national

economy), and copy machine operator (10,000 such positions in the national economy).

*Id.* at 1299–1301. Consequently, the ALJ found that prior to turning 22 years old, Plaintiff was

capable of adjusting to "other work that exists in significant numbers in the national

economy" and determined she was not disabled. *Id.* at 1302.

### DISCUSSION

On appeal to this Court, Plaintiff challenges only the ALJ's determination of her RFC.

She argues (1) the medical evidence in the record was inadequately developed (Doc. 14, at 5–

11), and (2) the ALJ improperly evaluated her credibility, *id.* at 11–15. For the reasons

explained below, the Court finds that the ALJ committed reversible error.

This case is deceptively simple. In a prior hearing, the ALJ had determined at Step Two that Plaintiff's EDS was not a "medically determinable impairment" because it had not been diagnosed before she turned 22. (Tr. 1401). The Agency's Appeals Council directed the ALJ to reconsider that determination in light of evidence in the record "show[ing] significant findings prior to her diagnosis during the period at issue that could reasonably be attributed to [EDS]." *Id.* The Council then advised the ALJ that she should, if necessary, "obtain evidence from a medical expert related to the nature and severity of and functional limitations resulting from [her] impairments." *Id.* at 1402. The ALJ indeed found that Plaintiff's EDS was a "severe impairment" at Step Two. *Id.* at 1280.

But, despite the Appeals Council's directive, the ALJ went on to determine the significance of Plaintiff's EDS and its effects on her RFC based solely on medical evidence pre-dating her diagnosis. [13] *Id.* at 1294–99. Specifically, the ALJ interpreted the effect of Plaintiff's EDS diagnosis on the RFC in the following way:

---

[13] Though the ALJ did cite some medical evidence concerning Plaintiff's EDS from after her diagnosis (Tr. 1294 (first citing Tr. 1152–53; then citing Tr. 1162–68; then citing Tr. 1169–73; and then citing Tr. 1186–87)), this evidence does not appear to have been used to determine Plaintiff's RFC limitations. Specifically, the ALJ uses these citations to support the proposition that, "[a]lthough diagnosis of [EDS] occurred after the attainment of [Plaintiff's] 22nd birthday, records suggest it is correlated with her symptoms and medical findings prior to the age of 22." *Id.* After describing the medical evidence from 2018 and 2020 concerning Plaintiff's EDS diagnosis, the ALJ lists medical evidence of symptoms consistent with EDS from the relevant period before finally "conclude[ing] [that] such symptoms are related to and correlated with the ultimate diagnosis of [EDS]." *Id.* at 1294–95. In other words, the only reference to medical evidence post-dating the EDS diagnosis is used to show that the condition existed during the relevant time-period. The post-diagnosis medical evidence is *not* referenced to explain the limitations in the RFC. *See id.* at 1288–92 (discussing medical evidence from 2013 through 2017); *id.* at 1295 (discussing state-agency disability determinations from 2016); *id.* at 1296 (discussing notes from her primary care provider and a licensed clinical professional counselor from 2014 through 2016); *id.* at 1297–98 (first discussing psychological treatment notes and evaluations from 2016; and then discussing state-agency disability determinations from 2016 in comparison to hospital and primary care provider records from 2013 through 2017).

Based on the foregoing, I considered all of this information, including mental health and physical limitations discussed in detail above, in carefully developing the residual functional capacity. Specifically, the claimant is limited to a light exertional level to account for reduced lifting/carrying, <u>given the severe impairments Ehlers-Danlos syndrome</u> [sic], with accompanying symptoms such as pain and abdominal symptoms, all of which could be worsened and/or pose difficulties in the lifting/carrying of increased weights. She must also avoid climbing ladders, ramps, and scaffolds and only occasionally climb ramps and stairs, balancing, stooping, kneeling, crouching, and crawling, as such activities would aggravate her symptoms, such as pain and abdominal effects, or could pose safety risks should she experience these symptoms while performing these activities.

*Id.* at 1298 (emphasis added).

Plaintiff argues that the ALJ's refusal to obtain new evidence from a medical expert resulted in three legal violations:

(1) a failure to develop the record as legally required under, e.g., *Thomas v. Colvin*, 745 F.3d 802, 807 (7th Cir. 2014);

(2) a failure to "rely on expert opinions instead of determining the significance of particular medical findings" herself, thus impermissibly "play[ing] doctor," under, e.g., *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)); and

(3) a failure "to submit . . . to medical scrutiny . . . new and potentially decisive medical evidence" under, e.g., *Goins*, 764 F.3d at 680.

(*See* Doc. 14, at 5). Though the Court does not decide whether the ALJ breached a duty to fully develop the record, the ALJ certainly committed the second two errors.

Under Seventh Circuit precedent, "[a]n ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the reviewing physician's opinion." *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018) (first citing *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016); and then citing *Goins*, 764 F.3d at 680). The reason for this rule is that "[t]he ALJ and the Commissioner are not medical experts," *Paul R.C. v. Comm'r of Soc. Sec.*, No. 18-cv-2184, 2020 WL 510134, at *5

(S.D. Ill. Jan. 31, 2020), so they err when they determine for themselves the significance of new medical evidence without the benefit of an expert opinion. *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018) (ALJ had "impermissibly 'played doctor'" by determining for himself that new medical evidence was "'consistent' with [the claimant's] impairments" without "[seeking] an updated medical opinion"); *see also Goins*, 764 F.3d at 680 (describing as "fatal[]" an ALJ's failure to submit "new and potentially decisive medical evidence" to "medical scrutiny"). In other words, this case comes down to a single question: was Plaintiff's EDS diagnosis a "new, significant medical diagnos[is]" that "reasonably could have changed the reviewing physician[s'] opinion[s]"? *Moreno*, 882 F.3d at 729.

Plaintiff has made a sufficient showing that, under *Moreno*, the ALJ was required to submit her EDS diagnosis to medical scrutiny. The record demonstrates that her EDS diagnosis is "new": none of the medical evidence considered by the ALJ was developed with knowledge of her EDS.[14] (*See* Tr. 1285–99). And the diagnosis is significant, as the ALJ herself determined it was a "severe impairment[]." *Id.* at 1280. Most importantly, knowledge of Plaintiff's EDS could reasonably have changed the reviewing physicians' opinions by providing an explanation for symptoms previously without known cause.

The record demonstrates that at least some of the medical experts charged with Plaintiff's care believed that some of her then-unexplained physical symptoms were caused, at least in part, by her mental illness. (*See* Tr. 632–34 (nurse practitioner in consultation with primary care provider suggesting that some of Plaintiff's physical complaints are "most likely related to her bipolar depression and anxiety," and recommending that she restart her

---

[14] *See supra* note 12 (explaining why the limited references to post-diagnosis medical evidence were not used to inform the appropriate limits in her RFC but were instead used merely to support the conclusion that Plaintiff *had* EDS during the relevant period).

psychiatric medication)). Indeed, as the Commissioner points out, Plaintiff's primary care provider appeared to agree with a social worker's assessment that Plaintiff's mother "enabled" her symptoms. (Doc. 18, at 11 (describing the view that "Plaintiff's mother may have been enabling her symptoms, with Plaintiff doing better when not in the presence of her mother" as having a "basis in the record" (first citing Tr. 447; and then citing Tr. 617))).[15] By providing an explanation other than mental illness or exaggeration based on her mother's influence, knowledge of the EDS diagnosis might very well have changed the reviewing physician's opinions.

An omission in the Commissioner's response brief buttresses the Court's conclusion. Namely, the Commissioner fails to make any counterargument or response to the claim that ALJ Jecklin played doctor and relied on outdated evidence. (*See* Doc. 18). The Commissioner

---

[15] That the medical experts in the record viewed Plaintiff's physical symptoms with skepticism is echoed in statements from the ALJ who initially reviewed Plaintiff's application. While not a medical professional, that ALJ reviewed her medical records (Tr. 42–43) and came away with the impression that her "physical impairments" were "more manifestations of mental health issues," *id.* at 77. As he stated to Plaintiff's mother during a colloquy at the April 6, 2018 hearing:

> I will just tell you where I'm at, and then give you a chance to tell me what I should think.
>
> . . . .
>
> . . . I know your daughter talks about physical impairments. I honestly believe they are more manifestations of mental health issues, and I am primarily focused on a mental health perspective. So, I have to ask myself from a mental health perspective, why can't this young lady work?

*Id.* at 77–78.

While this statement from a different ALJ does not bear directly on the "substantial evidence" question in this case, the Court finds it significant that the Plaintiff, the Commissioner, and the 2018 ALJ all came away with the same impression: that the medical record from 2013 through 2017 indicates that Plaintiff's physical symptoms (some of which we now know to be caused by EDS) were caused by something non-physical, whether mental illness or enablement by her mother. (*Compare* Doc. 14, at 7 ("[B]efore [Plaintiff] was finally diagnosed with EDS, her healthcare providers . . . attributed [Plaintiff's] physical complaints to her mental illness."), *and* Doc. 14, at 12 ("At the time, [Plaintiff's primary care provider] did not know that some of [Plaintiff's] reports of 'feeling poorly' were actually due to EDS, not somatic complaints."), *with* Doc. 18, at 11 (explaining that there is a "basis in the record" for the ALJ's findings that Plaintiff's symptoms may have been enabled by her mother rather than fully genuine), *and* Tr. 77–78 (statement of the ALJ attributing Plaintiff's physical impairments to mental illness)). This agreement suggests that, with the benefit of a diagnosis, the medical experts whose opinions make up the record might have come to different conclusions.

lists in some detail the evidence the ALJ considered, which was indeed voluminous. *Id.* at 4–11. But this response misses the forest for the trees. Plaintiff's argument is that ALJ Jecklin only considered evidence from before her EDS diagnosis. ALJ Jecklin must therefore have either (1) impermissibly played doctor by interpreting the significance of Plaintiff's EDS diagnosis herself, or (2) impermissibly relied on outdated medical evidence. Under Seventh Circuit precedent, either error is fatal. *See, e.g., Moreno*, 882 F.3d at 728–29; *Akin*, 887 F.3d at 317–18; *Goins*, 764 F.3d at 680. The Commissioner's argument—that the ALJ relied on a *lot* of outdated medical evidence—is thus no response at all.

Plaintiff argues that the ALJ violated the rules against playing doctor and relying on outdated assessments. The Commissioner provides no reason to think these rules are inapplicable here, and "it is not the responsibility of the Court to research and construct parties' arguments" for them. *Rocklane Co. v. Travelers Cas. Ins. Co. of Am.*, No. 17-cv-2158, 2020 WL 1320963, at *4 (S.D. Ind. Jan. 21, 2020); *see also United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) ("We repeatedly have made clear that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived . . . ." (quoting *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991))).

Because Plaintiff has shown that the ALJ's RFC determination was made without the benefit of any medical expert who was aware of her EDS diagnosis, and because the Commissioner has made no response to this showing, the Court finds that the ALJ failed "to 'provide a "logical bridge" between the evidence and [her] conclusions.'" *Paul R.C.*, 2020 WL 510134, at *6 (quoting *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)) ("Without the input of a medical expert, the ALJ's conclusion is not supported by the record.").

The Court acknowledges that "[t]he Social Security Administration's ALJs are

significantly overburdened with massive caseloads and insufficient resources" and therefore "credit[s] the ALJ with authoring a decision that reviewed and considered the lengthy record in detail." *Moreno*, 882 F.3d at 729. Nevertheless, "[w]ithout the input of a medical expert, the ALJ's conclusion is not supported by the record." *Paul R.C.*, 2020 WL 510134, at *6. Accordingly, the Court remands this action to the Agency to obtain new medical evidence "related to the nature and severity of and functional limitations resulting from" Plaintiff's EDS. (Tr. 1402).[16]

### CONCLUSION

For these reasons, the Commissioner's final decision denying Plaintiff's application for DAC benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**

**DATED:   March 12, 2026**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**

---

[16] Because the Court's remand requires the ALJ to obtain new medical evidence for use in determining Plaintiff's RFC, the Court does not address her other argument concerning whether the ALJ erred in evaluating the consistency of her statements with the medical evidence in the record. (Doc. 14, at 11–15).

Similarly, because the Court remands for further development of the evidentiary record, the Court cannot "look at the evidence in the record" and "predict with great confidence what the result on remand will be." *McKinzey v. Astrue*, 641 F.3d 884, 892 (7th Cir. 2011). Accordingly, the Court concludes the error was not harmless. (*Contra* Doc. 18, at 11).